T.C. Memo. 1996-465

UNITED STATES TAX COURT

DIAMOND CLAIMS & INVESTIGATION SERVICES, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5736-93.                    Filed October 16, 1996.

Merritt S. Yoelin and Michael D. Walker, for petitioner.

Shirley M. Francis, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, Judge:  Respondent determined a deficiency of
$234,870.48 in petitioner's Federal income tax for its taxable
year ended September 30, 1988.

The only issue remaining for decision is whether petitioner
must include in its income for the year at issue all, or only a
portion, of the amount awarded by the U.S. District Court for the

District of Oregon (District Court) to the plaintiffs in a lawsuit in which petitioner and two individuals, Peter J. Diamond (Mr. Diamond) and Shirley Diamond (Ms. Diamond), were identified as the plaintiffs. We hold that petitioner must include in its income only the portion stated herein.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner, Diamond Claims & Investigation Services, Inc. (DCI), is an Oregon corporation that was incorporated on August 21, 1979, and that had its principal place of business in Coos Bay, Oregon, at the time the petition was filed.

During the years 1980 through 1988, Mr. Diamond and Ms. Diamond, who were married, each owned 50 percent of the outstanding stock of DCI. They also were its only officers, serving as president and secretary, respectively. (Mr. Diamond and Ms. Diamond are sometimes referred to as the Diamonds.) As of the time of the trial herein, DCI was not actively engaged in a trade or business, was in existence in name only, and was wholly owned by Mr. Diamond, who inherited Ms. Diamond's stock in DCI after she died on May 6, 1990.

Throughout the years 1980 through 1988, DCI's principal business activity was the investigation of insurance claims and other insurance-related matters. During the years 1980 through 1984, DCI derived approximately 90 percent of its business from a group of related companies that were collectively known as

Farmers Insurance Group (FIG).[1]  That business consisted princi-
pally of (1) investigating suspected criminal and fraudulent
activities of FIG's agents, clients, and third-party claimants
and (2) training FIG personnel in the conduct of such investiga-
tions so as to enable FIG to establish an internal workforce with
that investigative capability.

During the years at issue, DCI sent FIG invoices for ser-
vices rendered that were prepared in accordance with FIG's
specifications and that pertained to different types of services
rendered, including investigative services and office and cleri-
cal services related to those investigative services.  Pursuant
to FIG's specifications, DCI's invoices also billed FIG for costs
that FIG agreed to reimburse (e.g., meals and lodging).

Evergreen Typing Service

Throughout all relevant periods, DCI required various
secretarial and clerical support services in order to conduct its
business operations.  During the years 1980 through 1982, DCI
first employed Ms. Diamond and then Headquarters, Inc. to provide
such services.  During the summer of 1982, DCI formed its own
secretarial and clerical support services business known as
Evergreen Typing Service (ETS) for the principal purpose of
providing such services to DCI in connection with the work that

---

[1]  DCI provided its services to a division within the legal
department of FIG known as the Criminal Investigations Division
(CID).

it was performing for FIG and other customers.[2]  During the early part of 1983, DCI sold ETS to the Diamonds, who thereafter owned and operated it as a sole proprietorship.[3]

During 1983 and all relevant periods thereafter, ETS was the exclusive provider to DCI of secretarial and clerical support services, such as typing, photocopying, transcribing, and answering the telephone, with DCI providing approximately 95 to 99 percent of ETS' business.  During those periods, ETS also made its clerical staff available to DCI for DCI's investigative work and permitted DCI's surveillance vans to be marked with ETS' logo.  During 1983 and 1984, virtually all of the services that ETS provided to DCI were related to the work that DCI was performing for FIG, and ETS provided certain of those services, such as the preparation of clerical reports, in accordance with FIG's specifications.

During 1983 and 1984, ETS sent DCI invoices for services rendered that identified, inter alia, the name of the case with respect to which it provided the service, the type of service rendered (e.g., typing or copying), and the charge for such

---

[2]  DCI informed certain FIG officials of its plans to form ETS. Those officials, who were concerned about the security of documents containing confidential information relating to the investigative work that DCI was conducting for FIG, assisted DCI in executing those plans.

[3]  At the time that DCI transferred the ownership of ETS to the Diamonds, Mr. Diamond informed FIG officials of that transfer.

service.[4]  At no time during those years did ETS submit invoices directly to FIG for the services that it provided to DCI in connection with DCI's work for FIG.  Rather, DCI billed FIG for those services, charging FIG the same amount that ETS had charged it.

The Diamonds reported the financial results of ETS in Schedule C of the Federal income tax return (return) that they filed for each of the years 1983, 1984, and 1985, as follows:

|  | 1983 | 1984 | 1985 |
|---|---|---|---|
| Gross receipts | $180,787 | $199,355 | $39,875 |
| Less:  Cost of goods sold | 62,201 | -- | -- |
| Plus:  Other income | 2,312 | -- | -- |
| Gross income | 120,898 | 199,355 | 39,875 |
| Less:  Expenses | 23,945 | 92,537 | -- |
| Net profit | 96,953 | 106,818 | 39,875 |

## The Farmers Lawsuit

### The Parties and Their Claims

In September 1984, DCI and the Diamonds, who were represented by the law firm of Markowitz & Herbold (Markowitz & Herbold), commenced a lawsuit (Farmers lawsuit) against FIG in the District Court.  The plaintiffs named in the Farmers lawsuit were "DIAMOND CLAIMS & INVESTIGATION SERVICES, INC., an Oregon corporation, and PETER J. DIAMOND and SHIRLEY DIAMOND, husband and wife" (plaintiffs).  The plaintiffs filed an initial com-

---

[4]  The particular information that ETS included in the invoices that it submitted to DCI during the years 1983 and 1984 was based on certain requirements specified by FIG in order to enable FIG to identify the costs associated with the particular investigative projects that it had assigned to DCI.

plaint (initial complaint), an amended complaint (amended complaint), and a second amended complaint (second amended complaint), and the plaintiffs and FIG submitted a pretrial order (pretrial order). In those submissions, the plaintiffs raised claims against FIG for breaches of contract, indemnity, and fraudulent misrepresentations and sought damages from FIG with respect to those claims.[5] The District Court ruled that the pretrial order (1) superseded the various complaints that the plaintiffs had filed in the Farmers lawsuit and (2) controlled the determination of any damages to be awarded to the plaintiffs.

In the pretrial order, the plaintiffs alleged, inter alia:

VI.    Contents of Fact

\* \* \* \* \* \* \*

2. In December, 1980, Michael Conn, acting as Director of CID and on behalf of all defendants, and plaintiffs, agreed as follows (these promises are hereinafter jointly referred to as "the agreement"):

a) That CID would assign to plaintiffs all investigations which were assigned to outside investi-

---

[5] In the initial complaint and in the amended complaint, the plaintiffs alleged that the parties to the agreement at issue in the Farmers lawsuit were FIG and "Diamond Claims" and that, as a result of FIG's breaches of contract and fraudulent misrepresentations, "plaintiff Diamond Claims has suffered lost revenue from investigation, consultation and clerical services; lost profits \* \* \* all to plaintiff Diamond Claims' damage in the amount of $5,000,000", and requested, inter alia, that the District Court enter a judgment against FIG and in favor of "Diamond Claims" in the amount of $5 million on account of its claims against FIG for breaches of contract and fraudulent misrepresentations. In the second amended complaint and in the pretrial order, references to "Diamond Claims" in the foregoing allegations were changed to references to "plaintiffs".

gators by CID on behalf of any defendant, for a period of five years from December, 1980, in Oregon, Washington, Idaho, Utah and Montana.

\*     \*     \*     \*     \*     \*     \*

     c)     That plaintiffs would perform investigations of suspected criminal and fraudulent activities among defendants' insureds, employees, agents and brokers in connection with CID's investigation and attempted prosecution of insurance fraud; provide equipment necessary thereto; and provide consulting services, training and assistance necessary to enable CID to establish and develop internal units with personnel capable of conducting such investigations on an in-house basis.

\*     \*     \*     \*     \*     \*     \*

4.     From 1980-1984, plaintiffs performed investigations described in paragraph VI-2(c) on behalf of defendants.

\*     \*     \*     \*     \*     \*     \*

6.     \* \* \* During 1980 to 1984, plaintiffs assisted in training CID's regional (in-house) Criminal Investigators.  Plaintiffs built their own organization capable of handling the defendants' investigation needs.  \* \* \*  Plaintiffs Peter and Shirley Diamond devoted substantial time, effort and resources to their performance of their agreement with defendants.  \* \* \*

7.     In the summer of 1982, DCI started a business called Evergreen Typing Service (hereinafter ETS) for the purpose of providing transcription services to defendants in connection with investigations.  Ownership of the business was later transferred to Peter and Shirley Diamond.  From time to time, plaintiffs invested in new equipment for ETS and hired employees for the purpose of dealing with CID's workload.  From 1982 to 1984, ETS provided services to defendants.

8.     Plaintiffs' actions in performance of their agreement with defendants were done at the request of defendants and with their knowledge, and were necessary to the performance of plaintiffs' agreement with defendants.  Plaintiffs have performed all of their obligations under their agreement with defendants.

9. Sometime in 1981 or 1982, CID began using outside investigators other than plaintiffs in Oregon, Washington, Idaho, Utah and Montana for cases which should have been assigned to plaintiffs under the agreement. This practice continued up to the present. This practice was in breach of defendants' agreement with plaintiffs.

*    *    *    *    *    *    *

16. In May, 1984, Mr. Conn on behalf of all defendants promised plaintiffs that agreements between plaintiffs and defendants would be extended for a period of two years. * * *

*    *    *    *    *    *    *

18. On November 9, 1984, Ronald Burlison wrote a letter to plaintiffs stating that they should "cease all work" on defendants' files. Since that time defendants have assigned no cases to plaintiffs.

*    *    *    *    *    *    *

20. Defendants breached their agreements with plaintiffs as follows:

a) CID failed to assign to plaintiffs all of its investigations done by outside investigators in Oregon, Washington, Utah, Montana and Idaho, from December 1980 to May, 1986.

*    *    *    *    *    *    *

21. Plaintiffs were damaged by defendants' breaches as follows:

*    *    *    *    *    *    *

b) They lost profits on investigations defendants assigned to other investigators from 1981 to May, 1986, in the approximate amount of $5.5 million.

*    *    *    *    *    *    *

22. Defendants repeatedly made false misrepresentations to plaintiffs and concealed the true state of affairs from plaintiffs with the knowledge and intent that plaintiffs would rely on the representations to

their detriment, as follows:

a) Defendants repeatedly represented to plaintiffs that plaintiffs were receiving and would continue to receive all of CID's assignments to outside investigators in Oregon, Washington, Idaho, Montana and Utah, when plaintiffs were not receiving all such assignments, defendants had no intention of giving plaintiffs all such assignments, and CID's policy expressed to its regional Criminal Investigators was that assignments would be made on a case-by-case basis.

\* \* \* \* \* \* \*

d) Defendants repeatedly represented to plaintiffs that plaintiffs would be indemnified and held harmless by defendants when defendants never intended to indemnify plaintiffs, and never did indemnify plaintiffs or reimburse plaintiffs for plaintiffs' legal fees, costs, and expenses.

\* \* \* \* \* \* \*

28. As a result of defendants' fraudulent acts as described above, plaintiffs were damaged as set out \* \* \* [in connection with their claim for breaches of contract]; plaintiffs Peter and Shirley Diamond suffered embarrassment, humiliation, emotional distress and mental pain and suffering to their damage in the amount of $500,000 each; plaintiff DCI is entitled to punitive damages of $25 million; and plaintiffs Peter and Shirley Diamond are entitled to punitive damages of $25 million.

\* \* \* \* \* \* \*

VII.    <u>Contentions of Law</u>

\* \* \* \* \* \* \*

1. All of the named defendants are liable to plaintiffs for the damages described above.

2. All defendants and all plaintiffs were parties to and are bound by the agreement, and are entitled to the benefits thereof.

\* \* \* \* \* \* \*

9.    Plaintiffs Peter and Shirley Diamond are entitled to recover their lost income, including loss of profits from ETS, and increased expenses, arising from defendants' fraud and breach of their agreement with plaintiffs.

In the pretrial order, FIG denied all of the plaintiffs' allegations, including the foregoing, and alleged, inter alia, that the Diamonds were not entitled to recover any damages on account of claims against FIG that properly belonged to DCI.

Proceedings Before and Rulings
By the District Court

### Imposition of Sanctions

At the conclusion of the pretrial discovery period in the Farmers lawsuit, the plaintiffs filed a motion (motion for sanctions) in which they alleged that FIG had committed various discovery abuses and requested that the District Court enter sanctions against FIG by striking FIG's amended answer and counterclaims, entering a judgment in favor of the plaintiffs, and awarding attorneys' fees and costs to the plaintiffs.  On September 9, 1986, the District Court issued an order (order) granting the plaintiffs' motion for sanctions and indicating that it would enter a default judgment in favor of the plaintiffs following an evidentiary hearing (damages hearing) to determine the amount of damages that they suffered.

### Damages Hearing

On October 21 and 22, 1986, the District Court held a damages hearing at which the plaintiffs presented evidence with

respect to their claims for damages for lost profits on account of FIG's breaches of contract and fraudulent misrepresentations. That evidence included the testimony of Donald Wharton (Mr. Wharton), a certified public accountant whom the plaintiffs had retained for the purpose of determining the profits lost by DCI and by the Diamonds as a result of those actions of FIG.

At the damages hearing, Mr. Wharton testified that, in determining lost profits, he took account of the profits lost by DCI, as well as the profits lost by ETS, and that he treated ETS as a division of DCI. In this connection, Mr. Wharton testified that it was his understanding that ETS was owned by the Diamonds, that it was formed sometime during 1982, and that it provided services almost exclusively for DCI.

Mr. Wharton further testified at the damages hearing that he and others working under his supervision had prepared several analyses of the profits lost by DCI and by ETS as a result of FIG's breaches of contract and fraudulent misrepresentations and that, in determining those profits, he relied principally on one of those analyses referred to as Analysis 1 (Analysis 1) that was entitled "Additional Profits due to DCI - 1981-1985, Measure number one - Using historical hourly rates for investigators' services and historical markups on other revenues".[6] Analysis 1

---

[6] Although the title of Analysis 1 referred only to DCI, as stated above, in reaching the conclusions shown in Analysis 1, Mr. Wharton aggregated the operations of DCI and ETS.

reflected the following conclusions of Mr. Wharton about the lost
revenue, the direct costs, the variable overhead costs, and the
lost profits of both DCI and ETS:

```
Additional revenues
  Service . . . . . . . . . . . . $1,957,613
  Mileage . . . . . . . . . . . .    169,420
  Office  . . . . . . . . . . . .    553,745
  Photo, phone, and
    reimbursable items  . . . . .    309,574   $2,990,352
Less:  Direct costs
  Service . . . . . . . . . . . .    738,420
  Mileage . . . . . . . . . . . .    145,212
  Office  . . . . . . . . . . . .    174,939
  Photo, phone, and
    reimbursable items  . . . . .    281,430    1,340,001
Less:  Variable overhead costs  .                 155,132
Additional profits  . . . . . .                 1,495,219
```

Mr. Wharton explained at the damages hearing the approach
that he used in preparing Analysis 1 and in arriving at the
conclusions set forth therein, as follows:

(1)  Mr. Wharton first determined that DCI and ETS lost the
following amounts of additional revenue during the years indi-
cated:

| Year | Amount |
|------|--------|
| 1981 | $56,993 |
| 1982 | 488,522 |
| 1983 | 865,182 |
| 1984 | 983,918 |
| 1985 | 595,737 |
| Total lost revenues | 2,990,352 |

Mr. Wharton made the foregoing determinations by examining
certain invoices that private investigative agencies other than
DCI had submitted to FIG during the period 1981 through 1985 for
work that he determined should have been assigned to DCI under

the agreement at issue in the Farmers lawsuit and by examining certain other records that were obtained from FIG containing the charges for such work.

(2)  Mr. Wharton next analyzed certain historical financial data of DCI and ETS that showed the categories, and the amounts in each category, of revenues received by DCI and by ETS during the years 1981 through 1984.  Based on that analysis, Mr. Wharton concluded there were the following four categories of revenues received by DCI or ETS during those years, (a) service, (b) mileage, (c) office, and (d) photo, phone, and reimbursable items. He allocated the total lost revenues of $2,990,352 among those four categories in proportions that reflected the historical data relating to those years that he had analyzed.

(3)  Mr. Wharton next analyzed certain historical financial data of DCI and ETS that indicated the relationship of costs to revenues within each of the four categories of revenues shown in Analysis 1.  Based on that analysis, Mr. Wharton determined the direct costs that DCI or ETS would have incurred in generating the lost revenues within each of those categories.

(4)  Mr. Wharton next conducted "a study of the general administrative-type expenses" to determine the additional variable overhead costs (variable overhead) that DCI or ETS would have incurred on an annual basis during 1981 through 1985 in generating the $2,990,352 of total lost revenues for that period.

(5)  Mr. Wharton next reduced the total lost revenues by the

total direct costs and the variable overhead to arrive at the total profits that DCI and ETS lost during the period 1981 through 1985, which he labeled in Analysis 1 as "Additional Profit due DCI".

With respect to the portion of the total lost profits reflected in Analysis 1 that was attributable to ETS, Mr. Wharton testified at the damages hearing that although he was unable to determine that portion precisely, "the bulk of what is in the office profitability would have been from Evergreen." In that regard, Mr. Wharton further testified with respect to Analysis 1 that: (1) The lost revenues of $553,745 that he allocated to the office category were lost revenues from clerical and secretarial services such as typing, photocopying, and transcribing; (2) the direct costs of $174,939 that he allocated to the office category were costs that would have been associated with the lost revenues in that category including variable office costs, such as hourly rates charged by typists; and (3) the variable overhead of $155,132 included additional costs that would have been associated with the lost revenues in the office category.

### The District Court's Award of Damages

On January 20, 1987, the District Court issued an opinion (opinion) in the Farmers lawsuit. In that opinion, the District Court concluded that the effects of the entry of default in favor of the plaintiffs and against FIG were (1) to treat as established the plaintiffs' factual allegations in the pretrial order

relating to their claims against FIG for breaches of contract, indemnity, and fraudulent misrepresentations and (2) to hold FIG liable to the plaintiffs on each of those claims.  Based on the plaintiffs' allegations in the pretrial order, the District Court specifically found in its opinion, inter alia, that DCI started a business during 1982 known as ETS for the purpose of providing transcription services to FIG and that DCI later transferred ownership of that business to the Diamonds.

In its opinion, the District Court awarded the plaintiffs, viz., Diamond Claims & Investigation Services, Inc., and Peter J. Diamond and Shirley Diamond, the following types of damages in the amounts and for the claims indicated:

| Plaintiffs' Claims | Type of Damages Awarded | Amount of Damages Awarded |
|---|---|---|
| Breaches of contract | Lost profits damages | $1,497,015.51 |
| Indemnity | Indemnity damages | 63,159.00 |
| Fraudulent misrepresentations[7] | Punitive damages and reliance damages | 290,715.00 35,746.00 |
| Total | | 1,886,635.51 |

On February 26, 1987, the District Court entered a judgment (District Court's judgment) that "plaintiffs shall recover from defendants the sum of $1,886,635.51, together with interest at the rate of 6.09 percent from the date of entry of judgment".[8]

With respect to the lost profits damages, the District Court

_____

[7]  The District Court did not award the Diamonds any damages for the emotional distress that they claimed they suffered as a result of FIG's fraudulent misrepresentations.

[8]  Hereinafter, all dollar amounts are rounded.

relied on Analysis 1 and Mr. Wharton's testimony at the damages hearing, finding that, with a few minor exceptions, Mr. Wharton's determinations set forth in Analysis 1 were reasonable. The District Court made the following minor adjustments to Mr. Wharton's determinations in Analysis 1 in order to reflect certain additional evidence presented at the damages hearing: (1) It increased lost revenue for the period 1984 and 1985 by $21,593 and the total lost revenues for the period 1981 through 1985 by that same amount; (2) it increased direct costs for the period 1984 and 1985 by $10,797 to reflect the cost of generating that additional revenue and the total direct costs for the period 1981 through 1985 by that same amount; and (3) it increased variable overhead by $9,000 of additional monthly rents that would have been incurred during an unspecified period of time during the period 1981 through 1985 to generate the total lost revenues reflected in Analysis 1 during those years.

### The District Court's Award of Attorneys' Fees and Costs

The plaintiffs sought $240,137 in attorneys' fees, and the District Court scheduled an evidentiary hearing on that request. In June 1987, the District Court awarded the plaintiffs attorneys' fees and costs in the total amount of $220,360.

### FIG's Appeal of the District Court's Judgment

FIG appealed the District Court's judgment to the U.S. Court of Appeals for the Ninth Circuit. In June 1988, the Court of

Appeals affirmed the imposition of sanctions and the award to the plaintiffs of lost profits damages, indemnity damages, and punitive damages and reversed the award of reliance damages.

Satisfaction of the District Court's
Judgment in the Farmers Lawsuit

On or about August 4, 1988, the attorneys representing FIG in the Farmers lawsuit delivered to the plaintiffs' attorneys, Markowitz & Herbold, a check issued by FIG, dated August 3, 1988 (FIG check), in the amount of $2,254,983 (proceeds of the Farmers lawsuit) and a letter attached thereto (FIG letter). The FIG check was made payable to the plaintiffs in the Farmers lawsuit (viz., DCI, Peter Diamond, and Shirley Diamond) and to Markowitz & Herbold. The FIG letter stated, inter alia, that the check represented full payment by FIG of the plaintiffs' claims, as follows:

| | |
|---|---|
| Amount of judgment | $1,850,890[9] |
| Interest on judgment | 161,821 |
| Attorneys' fees | 220,360[10] |

---

[9] This amount consisted of all the damages that the District Court awarded to the plaintiffs, except reliance damages.

[10] Although the District Court awarded the plaintiffs $220,360 in attorneys' fees and costs, the FIG letter indicated that the proceeds of the Farmers lawsuit included a total of $226,212 in attorneys' fees and costs. Moreover, although the District Court's judgment awarding attorneys' fees and costs to the plaintiffs does not indicate that the plaintiffs were also awarded interest on those fees and costs, the FIG letter indicated that the proceeds of the Farmers lawsuit included a total of $15,369 in interest on those fees and costs. The record does not explain the reasons for those discrepancies, and the parties do not advance any argument about them. Despite the foregoing

(continued...)

| Interest on attorneys' fees | 15,369 |
| Costs | 5,626[11] |
| Appeal costs | 226[12] |
| Per diem interest | 691 |
| Total | 2,254,983 |

The FIG check was endorsed by (1) Peter Diamond as president of DCI, (2) Peter Diamond as an individual, (3) Shirley Diamond as an individual, and (4) David Markowitz and Barrie Herbold and was deposited into the client trust account of Markowitz & Herbold.

Minutes of Certain DCI Meetings
and Certain Correspondence of DCI
<u>With Respect to the Farmers Lawsuit</u>

The minutes of a special meeting of DCI, dated December 12, 1984 (December 12, 1984 minutes) and signed by the Diamonds in their capacity as shareholders of DCI, made reference to the Farmers lawsuit and stated in pertinent part:

> As is already known, the corporation is engaged in litigation against Farmers Insurance. Resulting effects to the corporation are going to be a continued drain of its financial capability * * *. * * * Evergreen Typing Service, Peter Diamond and Shirley Diamond will continue to provide the support services that formerly were given by Evergreen Typing Service.

> In light of this, they have agreed to not bill for their services rendered during the course of the litigation if DCI will assume the litigation expenses, court costs, attorneys [sic] fees, etc.

---

[10](...continued)
discrepancies, since the parties proceed on the assumption that the District Court awarded damages, attorneys' fees and costs, and interest to the plaintiffs in amounts stated in the FIG letter, we shall also proceed on that assumption.

[11] See <u>supra</u> note 10.

[12] See <u>supra</u> note 10.

Additionally, they have agreed that they will also be compensated for the loss of Evergreen Typing Service profits as a result of the breach of contract in [sic] case giving rise to the Farmers litigation engaged in by the corporation. They will be deferring those profit dollars, however, until such time as the litigation has been successful. The Diamonds have also agreed that they will not bring a separate lawsuit against the corporation (DCI) for any breach of contract that the corporation would have been responsible for to Evergreen Typing Service.

A letter on DCI's stationery that was signed by Mr. Diamond, addressed to the Diamonds and to ETS, and dated December 12, 1984 (December 12, 1984 letter) also made reference to the Farmers lawsuit and stated in pertinent part:

This will confirm the corporation's agreement to extend any and all expenses with regard to the litigation engaged in by ourselves as against Farmers Insurance. Since this litigation is to our mutual benefit, there is no need to reiterate its content as we are all parties. However [sic] the purpose of this letter is to affirm that all litigation expenses, attorneys [sic] fees, trial costs, etc., will be paid for by the corporation in exchange for your continued support services throughout the litigation and your refraining from bringing any separate [sic] litigation against the corporation for any liabilities owed to Evergreen Typing Service or yourselves, individually.

This will also aknowledge [sic] that our arrangement indicated above will have no effect on your company's recovery at time of settlement or judgement as against Farmers Insurance, et al. Nor will the litigation expenses extended by DCI have any offsetting effect as against any judgement due Evergreen Typing Service or yourselves individually as proprietors.

The minutes of a meeting of DCI, dated December 30, 1984 (December 30, 1984 minutes) and signed by the Diamonds in their capacity as shareholders of DCI, also made reference to the Farmers lawsuit and to certain rental payments that DCI owed the

Diamonds and stated in pertinent part:

> the Diamonds have agreed to forestall collection of
> rent until such time as judgement has been rendered in
> the litigation ongoing.  This is also in consideration
> of the risk that litigation may be unsuccessful, and
> the Diamonds would be out their rent due.  They are
> willing to extend this credit as further consideration
> to avoid personal litigation expenses in the ongoing
> suit.

Allocation by DCI and the Diamonds of
the Proceeds of the Farmers Lawsuit

On August 9, 1988, the Diamonds, in their capacity as the
officers and shareholders of DCI and in their capacity as the
owners of ETS, met with attorneys from Markowitz & Herbold in
order to discuss how the proceeds of the Farmers lawsuit should
be divided or allocated between DCI and the Diamonds as the
owners of ETS.  On that date, Markowitz & Herbold issued a check
to DCI in the amount of $1,162,780, which contained a notation
indicating that that check was in "settlement of claims" and
which was endorsed by Mr. Diamond as president of DCI.  On that
same date, Markowitz & Herbold also issued a check to Mr. Diamond
in the amount of $400,000, which contained a notation indicating
that that check was in "settlement of personal claim", was
endorsed by Mr. Diamond as an individual, and represented the
Diamonds' share of the proceeds of the Farmers lawsuit as the
owners of ETS.  The law firm of Markowitz & Herbold retained
$692,203 of the proceeds of the Farmers lawsuit as attorneys'
fees and costs that were incurred in the Farmers lawsuit (attor-

neys' fees and costs actually incurred in the Farmers lawsuit).[13]

Sometime after the damages hearing, DCI and/or the Diamonds retained James Donnelly (Mr. Donnelly), a certified public accountant, to analyze how the proceeds of the Farmers lawsuit should be allocated between DCI and ETS. Mr. Donnelly made seven alternative analyses. In making those various analyses, he had access to, and relied on, inter alia, the following that he received from Mr. Diamond: (1) A copy of the District Court's opinion and (2) copies of certain evidence presented at the damages hearing, including copies of Analysis 1 and portions of the transcript containing Mr. Wharton's testimony, historical financial records of DCI and ETS, and Federal income tax returns filed by DCI and by the Diamonds. Mr. Donnelly recommended, and the board of directors of DCI and the Diamonds in their capacity as owners of ETS approved, the use of one of those analyses (selected allocation analysis).

Under the selected allocation analysis, Mr. Donnelly recommended that $446,981 of the lost profits damages be allocated to ETS. That amount, which was approximately 29.86 percent of those damages (selected allocation ratio), represented Mr. Donnelly's estimate of the profits that ETS would have earned during each of

---

[13] Although the attorneys' fees and costs actually incurred in the Farmers lawsuit were $692,203, the District Court awarded the plaintiffs $220,360 in attorneys' fees and costs, and FIG paid the plaintiffs $226,212 in attorneys' fees and costs. See supra note 10.

the years 1985 through 1988 if it had continued to operate as it had during the years 1983 and 1984, reduced by any profits that ETS actually earned during each of the years 1985 through 1988. Mr. Donnelly used the following approach to estimate what those profits would have been: (1) He calculated ETS' average net profits for the years 1983 and 1984 (viz., $110,248); (2) he used a constant annual inflation rate of 4 percent; (3) he concluded that if ETS had continued to operate during the years 1985, 1986, 1987, and 1988 as it had during 1983 and 1984, it would have earned profits of $114,658, $119,245, $124,015, and $128,976, respectively; (4) he determined that ETS actually earned profits of $39,875 during 1985 and reduced the 1985 estimated profits figure of $114,658 by that amount; and (5) he reduced the foregoing estimated profits figures for the years 1985 through 1988 by $38 to reflect certain rounding adjustments for all four years.

Under the selected allocation analysis, Mr. Donnelly also recommended (1) that his selected allocation ratio of 29.86 percent be applied to the punitive damages, the interest, and the attorneys' fees and costs components of the proceeds of the Farmers lawsuit and (2) that the resulting amounts be allocated to ETS. He also recommended that his selected allocation ratio of 29.86 percent be applied to the attorneys' fees and costs actually incurred in the Farmers lawsuit[14] and that the resulting

---

[14] In applying his selected allocation ratio to the attorneys'
                                                    (continued...)

amount be allocated to ETS and reduce the proceeds of the Farmers lawsuit that he had otherwise allocated to ETS under the selected allocation analysis.

Under the selected allocation analysis, Mr. Donnelly recommended that the proceeds of the Farmers lawsuit and the attorneys' fees and costs actually incurred in the Farmers lawsuit be allocated between DCI and ETS, as follows:

| Item Allocated | Total Amount of Item Allocated | Recommended Allocation to ETS | Recommended Allocation to DCI |
|---|---|---|---|
| Lost profits damages | $1,497,016 | $446,981 | $1,050,035 |
| Punitive damages | 290,715 | 86,714 | 204,001 |
| Indemnity damages | 63,159 | -0- | 63,159 |
| Interest | 177,881 | 53,115 | 124,766 |
| Attorneys' fees and costs | 226,212 | 67,547 | 158,665 |
| Total proceeds of the Farmers lawsuit | 2,254,983 | 654,357 | 1,600,626 |
| Less: Attorneys' fees and costs actually incurred in the Farmers lawsuit | 683,556 | 204,112 | 479,444 |
| Amount allocated | 1,571,427 | 450,245 | 1,121,182 |

Sometime after August 9, 1988, and prior to September 30, 1988, in reliance on Mr. Donnelly's recommendation under the selected allocation analysis, an additional allocation of $50,245 of the proceeds of the Farmers lawsuit was made to the Diamonds as the owners of ETS, thereby increasing the amount of the

---

[14](...continued)
fees and costs actually incurred in the Farmers lawsuit, Mr. Donnelly used $683,556 as the amount of such fees and costs. However, the actual amount of such fees and costs was $692,203. The record does not explain that discrepancy, and the parties make no argument about it.

proceeds of the Farmers lawsuit allocated to, and received by, the Diamonds as the owners of ETS from $400,000 to $450,245.

Tax Return Treatment

In the return that it filed for its taxable year ended September 30, 1988, and that Mr. Donnelly signed as return preparer, DCI included in gross income the entire amount of the proceeds of the Farmers lawsuit (viz., $2,254,983). DCI claimed a $450,245 deduction for "CONTRACT SERVICES". DCI also claimed various other deductions, including deductions for legal and accounting fees in the amounts of $715,814 and $9,708, respectively.

The Diamonds filed a joint return for 1988 that Mr. Donnelly signed as return preparer. In Schedule C of that return, the Diamonds reported $450,245 of gross receipts, $9,600 of other income, $1,696 of expenses that included $880 of legal and accounting fees, and $458,149 of net profits from the operations of ETS.

Notice of Deficiency

In the notice of deficiency (notice), respondent determined, inter alia, that DCI's taxable income for the taxable year ended September 30, 1988, must be increased by $411,086. The notice stated in pertinent part:

> It is determined that for the taxable year ended 9-30-88 your gross income is understated in the amount of $411,086.00 which represents a portion of the lawsuit income received from Farmers Insurance Company and improperly allocated to your sole shareholder. This

income is determined to be includible in your gross income and it has not been established that such amount is anything other than income to you. Accordingly, taxable income is increased $411,086.00 for the taxable year ended 9-30-88.

On May 3, 1993, respondent filed with the Court an answer (answer) to the petition that DCI had filed with the Court, in which respondent alleged, inter alia, (1) that respondent mis-characterized the adjustment in the notice to DCI's taxable income as an adjustment to its gross income, rather than as a disallowance of a claimed deduction for contract services in the amount of $411,086 and (2) that DCI is not entitled to that deduction because it constitutes a dividend or an attempted assignment of income to the Diamonds.

## OPINION

The District Court awarded the proceeds of the Farmers lawsuit[15] to the plaintiffs (viz., DCI and the Diamonds) without

---

[15] The components of the proceeds of the Farmers lawsuit were: (1) Lost profits damages of $1,497,016, (2) indemnity damages of $63,159, (3) punitive damages of $290,715, (4) attorneys' fees and costs of $226,212, and (5) interest of $177,881. Despite the District Court's awarding indemnity damages of $63,159 to all the plaintiffs (viz., DCI and the Diamonds), DCI does not contend that any portion of those indemnity damages is allocable to the Diamonds and thus not includible in its income for the year at issue. In contrast, although a portion of the interest component of the proceeds of the Farmers lawsuit was awarded with respect to indemnity damages, neither petitioner nor respondent contends that that portion of such interest component is not at issue. We conclude that the indemnity damages component of the proceeds of the Farmers lawsuit is not at issue in this case, but that all of the interest component of such proceeds is at issue. Accordingly, the amount of the proceeds of the Farmers lawsuit that remains at issue is $2,191,824. Hereinafter, any reference to
(continued...)

specifying how much of those proceeds it was awarding to each of those plaintiffs. In its return for the year at issue, DCI included in its gross income all the proceeds of the Farmers lawsuit and deducted as "CONTRACT SERVICES" $450,245. In their joint return for 1988, the Diamonds included that $450,245 as gross receipts.

DCI contends that it is entitled to the full amount (i.e., $450,245) of the deduction that it claimed for "CONTRACT SERVICES" because: (1) The Diamonds were the plaintiffs in the Farmers lawsuit in their capacity as the owners of ETS; (2) the proceeds of the Farmers lawsuit included damages that the District Court awarded to the Diamonds in that capacity; and (3) the proceeds of the Farmers lawsuit that were allocated to the Diamonds represented their share of the total proceeds of that lawsuit. In the alternative, DCI contends that it is entitled to the full amount of the deduction in question because DCI and the Diamonds entered into an agreement under which the Diamonds agreed, inter alia, to refrain from instituting a lawsuit against DCI for breach of contract in return for DCI's agreement to pay the Diamonds their share of the proceeds of the Farmers lawsuit.

Respondent counters that DCI is not entitled to $411,086 of the deduction that DCI claimed for "CONTRACT SERVICES" because

---

[15](...continued)
the proceeds of the Farmers lawsuit shall be to those proceeds that remain at issue.

DCI paid that amount to the Diamonds as a dividend.[16]

The parties frame the central issue that we must resolve as necessarily implicating section 162.[17] We assume that that is because, in its return for the year at issue, DCI included in its gross income all the proceeds of the Farmers lawsuit and deducted as "CONTRACT SERVICES" $450,245. We disagree with the parties' framing of the main issue that we must resolve as necessarily implicating section 162.[18] As we see it, the critical question that we must decide is the factual issue of whether the District Court awarded all, or only a portion, of the proceeds of the Farmers lawsuit to DCI. If we were to find that the District Court awarded a portion, and not all, of the proceeds of the Farmers lawsuit to DCI, only that portion would be includible in DCI's gross income for the year at issue; the remaining portion

---

[16] Although respondent does not offer any explanation as to why she conceded $39,159 of the $450,245 deduction that DCI claimed in its return for the year at issue, we shall not disturb that concession.

[17] All section references are to the Internal Revenue Code in effect for the year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

[18] Nor are we bound by DCI's treatment of the proceeds of the Farmers lawsuit in its return for the year at issue. Although, as respondent suggests, DCI's inclusion in that return of all of those proceeds might be construed as an admission by DCI that the Diamonds were not awarded any damages in the Farmers lawsuit in their capacity as the owners of ETS, we do not take it as such. This is because, inter alia, DCI also claimed in that return a deduction of $450,245, the portion of those proceeds received by the Diamonds in their capacity as the owners of ETS pursuant to Mr. Donnelly's recommendation.

of such proceeds would not be includible in DCI's gross income, but would be includible in the gross income of the person to whom the District Court awarded such portion; and DCI would not be entitled to deduct any portion of the proceeds of the Farmers lawsuit that is at issue.[19]  If we were to find that the District Court awarded all of the proceeds of the Farmers lawsuit to DCI, all of those proceeds would be includible in DCI's gross income for the year at issue.  In that event, we would have to address DCI's alternative contention that, because of a purported agreement entered into between DCI and the Diamonds pursuant to which DCI was to pay a portion of the proceeds of the Farmers lawsuit to the Diamonds, it is entitled to the deduction that it claimed under section 162 for the year at issue.

We turn first to whether the District Court awarded all, or only a portion, of the proceeds of the Farmers lawsuit to DCI.[20]  In deciding that question, we shall focus on the District Court's opinions and judgments in the Farmers lawsuit, the pretrial order submitted in that lawsuit, and certain evidence presented at the

[19]  See supra note 16.  We acknowledge that, for a given taxable year, including an item in gross income and then deducting a portion of it will generally produce the same result reached by excluding that portion from gross income and deducting no portion of the item in question.  However, we must reach that result by following the path mandated by the facts that we have found and the applicable law.

[20]  Although there was a dispute at trial as to whether respondent's answer raised a new matter and altered the burden of proof, our determinations are made on the record without regard to that question.

damages hearing on which the District Court expressly relied in awarding damages to the plaintiffs in that lawsuit. Cf. <u>Furrer v. Commissioner</u>, 566 F.2d 1115, 1116 (9th Cir. 1977), affg. T.C. Memo. 1976-331; <u>Church v. Commissioner</u>, 80 T.C. 1104, 1107 (1983).

In September 1984, DCI and the Diamonds commenced the Farmers lawsuit in the District Court by filing an initial complaint. Thereafter, they filed an amended complaint and a second amended complaint, and the plaintiffs and FIG submitted a pretrial order. In those submissions, the plaintiffs raised claims against FIG for breaches of contract, indemnity, and fraudulent misrepresentations and sought damages from FIG with respect to those claims. At the conclusion of the pretrial discovery period, the plaintiffs filed a motion for sanctions against FIG, and on September 9, 1986, the District Court issued an order granting that motion and indicating that it would enter a default judgment in favor of the plaintiffs following the damages hearing.

On January 20, 1987, the District Court rendered an opinion in which it concluded (1) that the pretrial order (a) superseded the various complaints that the plaintiffs had filed in the Farmers lawsuit and (b) controlled the determination of any damages to be awarded to the plaintiffs and (2) that the effects of the entry of default in favor of the plaintiffs and against FIG were to treat as established the plaintiffs' factual allega-

tions in the pretrial order relating to their claims against FIG for breaches of contract, indemnity, and fraudulent misrepresentations.

In the pretrial order, the Diamonds, as well as DCI, were identified as the plaintiffs in the Farmers lawsuit.[21] In that order, those plaintiffs raised claims against FIG for, inter alia, breaches of contract and fraudulent misrepresentations and sought damages from FIG with respect to those claims.[22]

With respect to the plaintiffs' claims against FIG for breaches of contract, the pretrial order alleged, inter alia: (1) That the plaintiffs were parties to, bound by, and entitled to the benefits of the agreement at issue in the Farmers lawsuit; (2) that DCI had started ETS during 1982 for the purpose of providing transcription services to FIG in connection with the investigative work that it was performing for FIG; (3) that DCI had thereafter transferred ownership of ETS to the Diamonds;

---

[21] Respondent contends that ETS was not identified as a plaintiff in the Farmers lawsuit. That ETS was not so identified does not preclude our finding that the Diamonds were the plaintiffs in the Farmers lawsuit in their capacity as the owners of ETS or that they were awarded damages in that capacity.

[22] We note that, at an early stage in the Farmers lawsuit, the plaintiffs apparently recognized that the initial complaint and the amended complaint were deficient insofar as those complaints indicated that the allegations in support of their claims of breaches of contract and fraudulent misrepresentations and in support of the damages sought on account of those claims were made solely by DCI, and not by the Diamonds, and they corrected those deficiencies in the second amended complaint and in the pretrial order.

(4) that DCI and the Diamonds periodically invested in new equipment for ETS and hired employees for the purpose of providing services to FIG; (5) that ETS provided services to FIG during the years 1982 through 1984; and (6) that FIG breached the agreement at issue in the Farmers lawsuit.

With respect to the plaintiffs' claims against FIG for fraudulent misrepresentations, the pretrial order alleged, inter alia, that FIG repeatedly made false misrepresentations to the plaintiffs and concealed the true state of affairs from the plaintiffs with the knowledge and intent that the plaintiffs would rely on such misrepresentations to their detriment.

With respect to the lost profits damages that the plaintiffs sought from FIG for breaches of contract and for fraudulent misrepresentations, the pretrial order alleged, inter alia: (1) That the plaintiffs suffered damages as a result of those actions of FIG; (2) that the plaintiffs lost profits on the investigative work that FIG assigned to investigative agencies other than DCI; and (3) that "Plaintiffs Peter and Shirley Diamond are entitled to recover their lost income, including loss of profits from ETS, and increased expenses, arising from defendants' fraud and breach of their agreement with plaintiffs."

With respect to the punitive damages that the plaintiffs sought from FIG for fraudulent misrepresentations, the pretrial order alleged that the Diamonds, as well as DCI, were entitled to punitive damages in the amount of $25 million.

Based on the plaintiffs' factual allegations in the pretrial order that the District Court treated as established, that Court held in its opinion that FIG was liable to the plaintiffs for breaches of contract, indemnity, and fraudulent misrepresentations.

The District Court then proceeded in its opinion to determine the damages to be awarded to the plaintiffs as a result of FIG's liability. In making that determination, the District Court relied on evidence that the plaintiffs presented at the damages hearing with respect to their claims for damages for lost profits due to FIG's breaches of contract and fraudulent misrepresentations, including Analysis 1 and the testimony of Mr. Wharton regarding that analysis. Mr. Wharton testified at the damages hearing (1) that it was his understanding that ETS was owned by the Diamonds; (2) that it was formed sometime during 1982; (3) that it provided services almost exclusively to DCI; (4) that, in determining lost profits, he took account of the profits lost by DCI, as well as the profits lost by ETS, and that he treated ETS as a division of DCI; (5) that he and others working under his supervision prepared several analyses of the profits lost by DCI and by ETS as a result of FIG's breaches of contract and fraudulent misrepresentations and that, in determining those profits, he relied principally on Analysis 1; (6) that, in reaching the conclusions shown in Analysis 1, he aggregated the operations of DCI and ETS; and (7) that although he was

unable to determine precisely the portion of the total lost profits reflected in Analysis 1 that was attributable to ETS, "the bulk of what is in the office profitability would have been from Evergreen." In that regard, Mr. Wharton further testified with respect to Analysis 1 that (1) the lost revenues of $553,745 that he allocated to the office category in Analysis 1 were lost revenues from clerical and secretarial services such as typing, photocopying, and transcribing; (2) the direct costs of $174,939 that he allocated to the office category were costs that would have been associated with the lost revenues in that category including variable office costs, such as hourly rates charged by typists; and (3) the variable overhead of $155,132 included additional costs that would have been associated with the lost revenues in the office category.

Based upon the pretrial order and evidence presented at the damages hearing, in its opinion, the District Court awarded to all the plaintiffs in the Farmers lawsuit (viz., DCI and the Diamonds), and not just to DCI, damages in the total amount of $1,886,636[23] for FIG's liability for breaches of contract, indemnity, and fraudulent misrepresentations. On February 26, 1987, it entered a judgment reflecting that opinion in favor of all the plaintiffs, and not just DCI, and for interest on those damages.

---

[23] This amount included the District Court's award to the plaintiffs of reliance damages, which was reversed by the U.S. Court of Appeals for the Ninth Circuit.

Thereafter, the plaintiffs sought attorneys' fees, and the District Court awarded attorneys' fees and costs to all the plaintiffs in the Farmers lawsuit, and not just to DCI.

Respondent points to the following language in the District Court's opinion to support her position that the District Court awarded all of the lost profits damages to DCI and did not award any portion of those damages to the Diamonds as the owners of ETS:

> Deducting the above costs and overhead items of $1,514,929.52 from the $3,011,945.03 total additional revenue that Diamond Claims would have received if Farmers had not breached their investigation services contract, I find that Diamond Claims' lost profits for the period 1981-1985 were $1,497,015.51.

We acknowledge that the foregoing language in the District Court's opinion, standing alone, appears to lend support to respondent's position. However, that language does not stand alone and should not be read in a vacuum without regard to all the other relevant facts relating to the District Court's award in the Farmers lawsuit that we have found. We believe that the reason that the District Court referred to the lost profits damages as "Diamond Claims' lost profits" is that it relied on and adopted Mr. Wharton's approach that was reflected in his testimony at the damages hearing and in Analysis 1 of treating ETS as a division of DCI for purposes of calculating the lost profits damages to be awarded to the plaintiffs in the Farmers lawsuit. Mr. Wharton testified at that hearing that, in deter-

mining lost profits, he took account of the profits lost by DCI, as well as the profits lost by ETS, that he treated ETS as a division of DCI, and that although he was unable to determine precisely the portion of the total lost profits attributable to ETS, "the bulk of what is in the office profitability would have been from Evergreen."

The following actions taken by the parties to the Farmers lawsuit subsequent to the District Court's opinions and judgments are consistent with those opinions and judgments: (1) FIG made the FIG check in payment of the proceeds of the Farmers lawsuit payable to all the plaintiffs in the Farmers lawsuit (viz., DCI, Peter Diamond, and Shirley Diamond), as well as their attorneys Markowitz & Herbold; (2) FIG prepared the FIG letter that accompanied the FIG check in which it stated, inter alia, that that check represented full payment by FIG of the plaintiffs' claims, without drawing any distinction between DCI and the Diamonds; and (3) Peter Diamond as president of DCI, Peter Diamond as an individual, Shirley Diamond as an individual, and David Markowitz and Barrie Herbold endorsed the FIG check.[24]

---

[24] We note that certain statements by DCI and the Diamonds in the Dec. 12, 1984 minutes, the Dec. 12, 1984 letter, and the Dec. 30, 1984 minutes also are consistent with the District Court's opinions and judgments in the Farmers lawsuit. Those documents all indicate that at an early stage in the Farmers lawsuit DCI and the Diamonds recognized that the Diamonds, in their capacity as the owners of ETS, were parties to the Farmers lawsuit and would be entitled to a portion of any amount that the District Court decided to award in that lawsuit.

Based on our examination of the entire record in this case, we find that the District Court awarded a portion of the proceeds of the Farmers lawsuit to DCI and a portion of those proceeds to the Diamonds as the owners of ETS.[25] Consequently, only the portion of such proceeds that the District Court awarded to DCI is includible in its gross income for the year at issue.[26]

The remaining question that we must resolve, which also is factual, is what are the respective amounts of the proceeds of the Farmers lawsuit that the District Court awarded to DCI and to the Diamonds as the owners of ETS.[27] In resolving that question,

---

[25] Respondent contends that no portion of the proceeds of the Farmers lawsuit was awarded to the Diamonds as the owners of ETS because there is no indication that there was a contractual relationship between FIG and the Diamonds as the owners of ETS. We reject that contention. The pretrial order alleged that the plaintiffs were parties to the agreement at issue in the Farmers lawsuit, that the Diamonds were entitled to lost profits from the operations of ETS as a result of FIG's breaches of contract and fraudulent misrepresentations, and that the Diamonds were entitled to punitive damages as a result of FIG's fraudulent misrepresentations. The District Court entered a default judgment in favor of, and awarded damages to, all the plaintiffs (viz., DCI and the Diamonds) on account of their claims against FIG for breaches of contract and fraudulent misrepresentations.

[26] In light of our finding that the District Court awarded a portion of the proceeds of the Farmers lawsuit to DCI and a portion of such proceeds to the Diamonds as the owners of ETS, we shall not address DCI's alternative contention, which we understand DCI would advance only in the event that we had not made such a finding, that it is entitled to deduct the $450,245 of the proceeds of the Farmers lawsuit that it claimed in its return for the year at issue because that is the amount that DCI was obligated to pay the Diamonds under an agreement entered into between them.

[27] We disagree with petitioner's suggestion on brief that re-
(continued...)

we shall address each of the following components of the proceeds of the Farmers lawsuit: (1) Lost profits damages of $1,497,016, (2) punitive damages of $290,715, (3) attorneys' fees and costs of $226,212, and (4) interest of $177,881. DCI contends that $1,121,182[28] should be allocated to DCI and that $450,245 should be allocated to the Diamonds as the owners of ETS. To support that contention, DCI relies on the selected allocation analysis that was (1) prepared by Mr. Donnelly, the certified public accountant who was retained to analyze how the proceeds of the Farmers lawsuit should be divided between DCI and the Diamonds as the owners of ETS and (2) relied on by DCI and the Diamonds when they allocated $1,121,182 of the proceeds of the Farmers lawsuit to DCI and $450,245 of those proceeds to the Diamonds as the owners of ETS. According to petitioner, those amounts represent the respective shares of DCI and the Diamonds (viz., $1,600,626 and $654,357, respectively) of the proceeds of the Farmers lawsuit as determined by Mr. Donnelly under the selected allocation analysis, reduced by their respective shares (viz., $479,444 and $204,112, respectively) of the attorneys' fees and costs actually incurred in the Farmers lawsuit as determined by Mr.

---

[27](...continued)
spondent conceded that issue. In fact, respondent states on brief that she made no concession with respect to "the disallowed contract services expense."

[28] That amount includes the indemnity damages of $63,159 that are not at issue in this case. See supra note 15.

Donnelly under that analysis.

We are unwilling to rely on Mr. Donnelly's selected allocation analysis because the District Court did not use that analysis (or any of Mr. Donnelly's other analyses) in determining the amount of damages that it awarded to the plaintiffs in the Farmers lawsuit.[29]  Instead, we shall rely on the District Court's order, opinions, and judgments in the Farmers lawsuit and on certain evidence presented at the damages hearing on which the District Court expressly relied in awarding damages to the plaintiffs.  Cf. Thomson v. Commissioner, 406 F.2d 1006, 1010 (9th Cir. 1969), affg. T.C. Memo. 1965-237; Niles v. United States, 520 F. Supp. 808, 813 (N.D. Cal. 1981), affd. 710 F.2d 1391 (9th Cir. 1983).

We turn first to the lost profits damages component of the proceeds of the Farmers lawsuit.  In determining the respective portions of the lost profits damages awarded to DCI and to the Diamonds as the owners of ETS, we have examined the entire record in this case and have focused on the following:  (1) The District Court's order granting the plaintiffs' motion for sanctions and the District Court's opinions and judgments awarding damages, attorneys' fees and costs, and interest to the plaintiffs;

---

[29]  We note that Mr. Donnelly's selected allocation analysis was (1) based on data different than those relied on by the District Court, (2) applied a methodology different than that applied by the District Court, and (3) focused on profits lost by ETS for years that were not the same years for which lost profits damages were awarded by the District Court.

(2) Analysis 1 on which the District Court relied in awarding the lost profits damages; (3) Mr. Wharton's testimony at the damages hearing regarding Analysis 1 on which the District Court relied in awarding those damages; (4) other evidence presented at the damages hearing on which the District Court relied in making a few minor adjustments to Mr. Wharton's determinations in Analysis 1; (5) those minor adjustments; and (6) the facts that DCI formed ETS in 1982 and operated it until sometime during the early part of 1983 at which time the Diamonds acquired and operated ETS as a sole proprietorship. We find on the record before us that, of the total amount of lost profits damages (viz., $1,497,016) that the District Court awarded to the plaintiffs in the Farmers lawsuit, $1,222,948 was awarded to DCI and $274,068 was awarded to the Diamonds as the owners of ETS.

As for the remainder of the proceeds of the Farmers lawsuit at issue, viz., punitive damages of $290,715, attorneys' fees and costs of $226,212,[30] and interest of $177,881, we believe that it is reasonable to assume that each of the foregoing components of those proceeds that were awarded to DCI and to the Diamonds as the owners of ETS were awarded in the same proportions as the lost profits damages were awarded, i.e., 81.69 percent to DCI and 18.31 percent to the Diamonds. Accordingly, we find that the District Court awarded each of the following components of the

--------

[30] See supra note 10.

proceeds of the Farmers lawsuit to DCI and to the Diamonds as the owners of ETS:

| Item Awarded | Amount Awarded to DCI | Amount Awarded to the Diamonds |
|---|---|---|
| Punitive damages | $237,485 | $53,230 |
| Attorneys' fees and costs | 184,792 | 41,420 |
| Interest | 145,311 | 32,570 |

Based on our review of the entire record in this case, we find that, of the proceeds of the Farmers lawsuit that are at issue (viz., $2,191,824), $1,790,536 was awarded to DCI and $401,288 was awarded to the Diamonds as the owners of ETS. Accordingly, only $1,790,536 of those proceeds is includible in DCI's gross income for the year at issue.[31]

To reflect the foregoing and the concessions of the parties,

Decision will be entered

under Rule 155.

_____

[31] The remaining portion of such proceeds, or $401,288, is not includible in DCI's gross income for the year at issue, and DCI is not entitled to the deduction of $411,086 on which the parties focus their arguments. In this connection, petitioner concedes on brief that, by allowing petitioner to deduct $39,159 of the total deduction claimed in its return for the year at issue with respect to the proceeds of the Farmers lawsuit, respondent did not include in petitioner's taxable income for that year $39,159 of those proceeds that are at issue and that the District Court awarded to the Diamonds as the owners of ETS. Consequently, in the Rule 155 computation, the parties shall take account of petitioner's concession so that the maximum amount of the pro-ceeds of the Farmers lawsuit that are at issue and that are not includible in the taxable income of DCI is $401,288.